On Case 17-5562, Lexington H-L Services Inc v. Lexington-Fayette Urb Cty Gvt, oral argument not to exceed 15 minutes per side, Mr. Mormon for the apology. Good morning, Your Honors. I'm Keith Mormon on behalf of the Lexington-Fayette Urb Cty Gvt, which, for convenience today, I may refer to as the City or the City of Lexington. I would like, Judge Clay, with your permission, to reserve three minutes for my rebuttal. All right. Your Honors, the City of Lexington, its council became aware through various complaints that there were problems occurring with unsolicited written materials being delivered in a haphazard manner to Lexington homes. The council then undertook to study that problem. They looked at it for 20 months. They conducted three public hearings. And they determined that there was a problem, that these unsolicited materials were washing into the storm sewers and creating health concerns. They were causing visual blight by piling up in yards and on driveways. And they were also creating safety concerns because it would tell a burglar or would-be burglar that nobody was home if there were many of these accumulating in the yard. The Urban County Council also studied a similar problem that had occurred in the City of Louisville. And they studied how the City of Louisville had dealt with that problem, including an ordinance that it had passed and which had been approved, essentially, by the Western District of Kentucky as passing First Amendment scrutiny. And the City of Lexington then passed virtually the same ordinance, which only impacts unsolicited written materials. It does not affect, for example, the newspaper that you have paid to have delivered to your house. And it does not ban unsolicited materials. It simply says they should be delivered in a particular place, one of six places, either on the porch, between the main door and the storm door, attached to the door, put through the mail slot, put in a receptacle, or hand it to the homeowner. Now, as you can see, all of those methods deal directly with the problem that had been identified. If you have materials that are laying out in yards and in driveways and washing into the street, then the best way to deal with that is to require that those materials be placed up close to the house, on a porch, or next to the door. So we are here today to determine whether, or to discuss whether, that ordinance is constitutional under the First Amendment. As you know, the district court analyzed the four factors that this court set out in Job, and it determined that the ordinance was content neutral and did serve a significant government purpose, but then went on to find that it was not narrowly tailored, because there was a less restrictive means available to the government, and that it did not leave ample alternatives available, because in this case the herald leader had put on evidence that it was going to raise the cost of their chosen method of delivery. And so based really simply on that additional cost, the district court found that there were no ample alternatives available. So I think, Your Honors, as you're well aware, there are many, many cases decided on the First Amendment, but I think this court needs look no further than its own decision in the Job v. City of Catlettsburg case to affirm or to reverse the district court and hold that this ordinance is constitutional. Job, as you know, dealt with an ordinance from the City of Catlettsburg in Kentucky that precluded persons from placing leaflets on private cars parked on public property. And the court there went through the analysis that was this narrowly tailored, and as the court said, relying on the Supreme Court case and the taxpayers for Vinson, because the problem was these leaflets being placed on cars and then blowing off and causing problems, of course it was narrowly tailored when the ordinance says you can't place leaflets on cars. So you had a direct correlation between the problem and the solution, and the same is true here. The problem is unsolicited materials piling up in yards and on driveways. The solution was you have to deliver those to a porch. It can't be any more narrowly tailored than that. We believe that the district court got off track because it slipped into an analysis of whether there was a better way to do this. And as our Supreme Court has stated in Ward v. Rock v. Racism and in the Taxpayer for Vinson, and as this court stated in Joe, less restrictive means analysis is not part of a time, place, or manner restriction analysis under intermediate scrutiny. How do we fit within your argument, your opponent's contention that courts should consider the fact that complying with the ordinance unduly burdens the communication they're trying to transmit by making it more expensive to deliver in compliance with the ordinance? Yes, Your Honor, that's the fourth prong on whether there's ample means available. And that was the Herald-Leader's argument was simply based on expense. The cases we have provided to the court have said that expense alone is not an aspect of First Amendment analysis, that the First Amendment guarantees a speaker the right to speak. It does not guarantee a speaker the right to speak profitably. And so here there's no evidence that the placing on the porch, the attaching to the door, the handing to the homeowner are not a good way to deliver the message. In fact, I would argue common sense says that's a better way to get your message to a homeowner is to hand it to them than to put it in a yard. The only question is does it raise the cost? And our analysis and our argument is, Your Honor, that just raising the cost does not control the issue of whether it's constitutional or not. I guess there's also a cost to the homeowner in having to gather up all this litter and suffering the blight to the property and the inconvenience of dealing with these papers potentially all over the yard and such. There's clearly a cost to the homeowner. There's clearly a cost to the urban county government because if the homeowner doesn't gather up the papers and dispose of them, then they wash into the streets and into the storm sewers, which cause other problems for the city. So, yes, there's cost both ways. And the question then is does the cost incurred by the herald leader alone sufficiently enough to make this ordinance unconstitutional? And there's no case law that would say that it does. There's no case law that says if your preferred means of delivery is your preferred means because it's cheap, that you get to keep doing it. All the cases say otherwise. The Kovacs opinion from the 40s, the Supreme Court case, said you can't get your message out by a loudspeaker. Well, that would certainly be a cheap way to get your message out. But the court said cheap doesn't trump the Constitution, doesn't trump the city's rights to limit how things are distributed. The same thing in taxpayers for Vincent. It was a very cheap way to get a message out to put a poster on a lamppost. But the court said the fact that it's cheap is not enough. And as this court said in Job, the fact that it's cheap to put leaflets onto a car is not the controlling factor. The factor is simply are there other means available? This court also said in Job, did they say that there's an exception if written permission was given by the recipient to receive the material on windshields? Yes. In there somewhere? The court in the Job case said that if persons who were parking their private cars on the street wanted to receive leaflets under their windshield, all they had to do was put a note on their car that we welcome leaflets. And the court said that was sufficient. So theoretically your opposing party would be in compliance with ordinance if they got permission from the homeowners to, they'd have to do it individually per homeowner, but from certain of the homeowners that they could throw the material anywhere in the yard they wanted to. If they did get that sort of permission, then they could do it. It would be fine and they wouldn't be in violation of the ordinance. That's correct, Your Honor, because if they have permission from the homeowner, it's no longer an unsolicited material. It's essentially a solicited material as to that homeowner. Actually, in this case, the discussion was the opposite. There was discussion, and Judge Caldwell considered the opt-out, right? She did, Your Honor. Right. An opt-out, she thought, was perhaps a less restrictive means. She did. That was the basis for her finding. So it's the same thing as I welcome it or I don't. Either way, a homeowner or a customer says don't give it or sure, I don't mind if it's on my porch. Well, I would say it's not the same thing, Your Honor, because who has the burden of actually exercising the opt-out? The Herald Leader's argument was that the city should undertake an education campaign across the city to educate people how not to have things thrown in their yard that they don't want. And the question is, does the First Amendment require that? By what means? Is that the opt-out? I'm sorry? By what means they should undertake this education to tell homeowners that they can opt-out? That's what the Herald Leader argued, and that's what Judge Caldwell accepted, was that the opt-out education policy would be a less restrictive way of promoting the government's desires. That, I would argue, has never been required. It is plausible. As the Supreme Court said in Taxpayers for Vincent, all of these alternatives may be perfectly good alternatives, but the issue is does the one alternative the government selected, is that constitutional? And here it is, Your Honor, and while we're on the opt-out, there's several issues with that. First, there was no evidence that the opt-out was actually working. The evidence from the government at the hearings was that people were calling and asking not to get the paper or not to get the community news, and it wasn't being honored. Second, while the community news had an opt-out provision on its publication, phone books, pizza coupons, other unsolicited materials did not. And so there was no way to enforce that. Opt-out only works if people are aware they're getting something. If you have a paper being delivered to a bush in front of your house, you may not know to opt-out because you don't know you got it. Or if there's an elderly or disabled person who doesn't go out in their yard, they may not know to opt-out. And finally, the opt-out, I would argue, creates a potentially worse violation because if the government starts calling its citizens saying, tell the Herald-Lear not to send their paper to you, that risks an argument that they're now interjecting their views into the content of a delivery. Here it's completely neutral. If the Herald-Lear wants to solicit people to request their delivery, there's nothing to stop them. And I see I'm out of time. If there's no further questions, I'll sit down. All right. Thank you. Thank you all. Thank you. Good morning. May it please the Court. John Bussion, Mark Prack, Brian Fork. Good morning. Let me ask you this. Wouldn't the entire problem be solved from your client's point of view if your client would just solicit permission from people to receive the delivery in the manner in which your client wants to deliver these materials and then there wouldn't be any objections to the way you want to deliver? The people then who would be receiving the delivery in the manner you want to deliver would be satisfied with that? Your Honor, the testimony before the trial court by Rufus Friday, who's with us here today in the courtroom, the publisher of the Lexington Herald-Lear, is that that's part of the purpose of distributing free newspapers. He not only distributes the main Herald-Lear that is circulated to paid subscribers, but he distributes that main publication, the daily newspaper in Lexington, to people who don't subscribe as a way of persuading them, prompting them, marketing to them why they ought to subscribe. And that's proven to him and to his operation to be more effective than trying to go one at a time to make personal contact with potential subscribers. So this TMC product, this total market coverage, this free newspaper distribution, both in the form of the Herald-Lear itself and the community news, which is the central focus of what the ordinance impacts, are time-honored methods of distributing a constitutionally protected vehicle of expression, a newspaper. So longstanding communicative tool in the words of the Job Court, this is one of those things that wasn't present there. It was just fine in Louisville, the same kind of restriction. The citizens voted for it, or I don't know whether it was a voted on thing. Was it? By the city. By the city. Okay, only the council. Anyway, it was passed by the council in Louisville, and it was upheld. It passed constitutional muster. Virtually the same thing, is it not? The two ordinances are nearly identical, Your Honor, and the district judge in this case went to great lengths in a nearly 20-page order to distinguish why the passage of that ordinance in Louisville and the district court's treatment of it there doesn't hold any water. Went in and looked at the Third Circuit decision upon which the court in Louisville hung its hat and said, look, this doesn't even implicate the right to distribute newspapers. And so to try to say that, therefore, that makes the statute constitutional just doesn't hold water here, and I'm going to show you why the analysis was before the court. Actually, Judge Caldwell went through each step and everything. She found no need for a preliminary injunction, no carrying the burden, until the one factor, and she went to analyze least restrictive, which the cases, Ward and others, say one needn't go there. But that has no place in time, place, and manner with intermediate scrutiny, right? And that's the only place. And she said, we can't tell whether it's least restrictive, so am I right? That's how she analyzed it. She actually went through two of the factors at the end, that the requirement for narrow tailoring, where she found opt-out, is a less restrictive, in the words of the U.S. Supreme Court, a less intrusive tool to address the problem. That decision came after all the ones we've been talking about after Ward, after Taxpayers v. Vincent, and it is the opinion in 2014 written by John Roberts, the Chief Justice, in the McCullen case, where he said, that's exactly what narrow tailoring is all about. In his words, there was no showing there by the State of Massachusetts that the State had seriously undertaken to address the problem with less intrusive tools. So that's where Judge Caldwell went with that second part of the test. She said less restrictive means. Judge Roberts, same concept, used the words less intrusive tools. But it was all the narrow tailoring part of this test that has to be applied. So she found a likelihood that the paralegal would prevail on the narrow tailoring test, because this isn't narrowly tailored enough, because the opt-out was clearly there, and the county didn't seriously look at using what had already been working really well in the market. A million and a half copies distributed in the three months before the hearing, only one formal complaint lodged with the paper. As you know, Mr. Mormon, the argument by your opponent is that with analyzing under intermediate scrutiny, one needn't evaluate least restrictive means. So what cases? There are cases against you on that, Ward, et cetera. So how do you best counter that? So Mr. Mormon's trying to say that what Judge Caldwell really did was use strict scrutiny and use the requirement in that test that there had to be a finding of the least restrictive means, when in fact what Judge Caldwell did was use intermediate scrutiny and she took a look at whether there were less restrictive, or in the words of the Supreme Court in McClellan, less intrusive tools available that the county didn't really take a serious look at to solve the same problem. As Chief Justice Roberts said over and over and over again in McClellan, it's not enough to just sort of say it's out there. You've got to look and analyze it. Mr. Mormon argued to Judge Caldwell that the intermediate narrow tailoring test doesn't require the county to do a good job in analyzing the problem. There just has to be a reason, and it's held up to the light, and a judgment call is made. No, what the Chief Justice said in McClellan is there has to be proof that the county took a hard look at less intrusive tools and that they wouldn't work. What about the five? I mean, I don't know. I thought that there were six ways one could distribute this without running afoul of the ordinance. They put out six. You're right, Your Honor. The one that you wish to use, your client wishes to use, doesn't fit within those six. It's the time-honored way of distributing newspapers in this country by throwing them in the driveway. From the time newsboys did it on bikes to the way it's done currently out of cars by people who are working those jobs for second and third streams of income, it's the same concept. So, yes, we are saying. To be clear, this is not a traditional newspaper. This is material that has not been solicited for which there's no subscription. I'm visualizing something with a lot of ads. Would that be fair? It has pages of stories, news stories, with a lot of ads, but it qualifies as a news product because it's an expressive tool, and Judge Caldwell so found that it qualified as noncommercial speech. Because you've got some stories in there, not just news. We have stories in there. But, of course, the ads can be commercial advertising. As they are in the main edition of the paper. Well, yes, there are an awful lot of ads, too. More and more these days. More and more ads and less and less news. In the main circulated paid subscription newspapers all across America. And this ordinance also applies to the free distribution of that main newspaper in Lexington, the Herald-Leader, which is for free to get subscribers to come forward. Neither Ward nor any other Supreme Court case endorses the concept that there has to be a utilization of the very best way or the way that seems to tread less on the interest here. I mean, the district court really is not to pick out its own idea of what would be a better way to do it. That's not the test. Well, Your Honor, I'd again submit that what the United States Supreme Court did more recently than all these other cases in McClellan v. Coakley says that the court's supposed to do exactly that. Look for a tool that burdens speech less substantially than the one chosen by the government so that the government's not completely free to pick any burdensome tool it wants. Yeah, but, Your Honor, intermediate scrutiny here. So all the interests can be looked at. Let me ask you this, counsel. Do you concede that the ordinance is content neutral? We have left for another day pending discovery, and that's what's important here. This was a temporary timeout by the trial judge pending discovery and a full development of the record. We would prove that it's not. But we haven't challenged it on appeal here today. You're right, Your Honor. Yeah, but I'd like for you to answer the question. The ordinance is laid out very specifically, and it says what it says, and I don't see why you can't tell me whether or not it appears to be content neutral or not. For the purposes of the argument here today, we're conceding that it's content neutral, and therefore the test, the three-part test applies that Judge Caldwell used, Your Honor. Well, from Ward, a regulation must be narrowly tailored to serve the government's legitimate content-neutral interest, but that it need not be the least restrictive or least intrusive means of doing so. Now, the law on that point hasn't changed, has it? It hasn't changed, Your Honor, but, again, in the McCullen case, Judge Roberts cited Ward and then went on to do what I consider to be making the most definitive statement on what narrow tailoring is. Had four other justices on the court join his opinion, and he went on to say, no, they don't have to pick the least intrusive one, but they have to consider, take a serious look at whether there are other lesser intrusive tools available to accomplish the same thing. And in this case, the evidence is uncontradicted, that's what Judge Caldwell had in front of her, that this county didn't really take a hard look at using the opt-out. The opt-out was working according to the testimony of Mr. Friday at the hearing. One complaint in 1,500,000 of these papers delivered in the three months before. How do you get around Judge Sutton's opinion in Job? Don't you lose under that opinion? Your Honor, Job, at the very end, offers two ways we think are here and weren't in the Job case, and Judge Sutton identified them. He said, and I'm paraphrasing what he said in the last paragraph, when he was looking at the Eighth Circuit's decision in Krantz, he said, what's different about this case is we don't have a time-honored means of communicating to the public. We know. We're dealing with somebody that was putting flyers underneath wiper blades on cars. This is a newspaper being distributed in the driveway the way that it's been done in this country for 150 years. So we have that. That's different. The opt-out provision addresses only really the convenience of the property resident in not having the yard littered. The city's ordinance addresses its interest, which is not having all this stuff there at all in a place where it could easily end up in another place and just be generally unattractive or dangerous litter in the area in which they're dropped. So I'm not sure how opt-out gets to be so terribly relevant to this dispute or so much better, because I don't see how it serves the city's interest. I mean, your notion that there's been one complaint would establish, would tend to make the city's interest in doing exactly what it did stronger, not weaker. Well, the opt-out again was mentioned, in fact, in response to your question, Judge Gibbons and Judge Clay's. The opt-out was another thing identified in the last paragraph of Joe. Judge Sutton said, you know, and if this were a case where we had an opt-out mechanism that worked, this outcome might be entirely different. So the opt-out. Opt-out. If I'm remembering, Job involves cars or something. Pretty distinct. Putting flyers underneath. Pretty distinct from the issue here and the governmental interest here. That's correct, Your Honor, and just so we're talking about competing interests and understand it's not just the government's interest in controlling litter, that the newspaper has a constitutional right to reach its readers by a variety of means. It's been protected. That has to be balanced. That has to be built in. That's what we went through in the case of the sister newspaper against the Raleigh-Durham Airport Authority, and Judge Wilkinson in the Fourth Circuit said, that's right. At some point, the constitutional right to deliver newspapers to readers, however the newspaper chooses to do it, has to be weighed and can't take a complete backseat to what the government professes are interests, especially when those interests can be dealt with in ways that are less burdensome on the First Amendment right to distribute newspapers. So those interests have to be put side by side. And Judge Caldwell You might want to wind up. Your red light's been on for a while there. Your Honor, thank you. We would just conclude by saying that Judge Caldwell's fact findings were not clearly erroneous. She did not abuse her discretion in calling a temporary timeout and granting the motion for preliminary injunction just until we can get to the trial and the ruling of the trial court should be affirmed. Thank you. Thank you, Judge. Brief let me follow up and I'll be jumping around. But on the question of can a newspaper choose how it wants to deliver no matter what, that's been answered by this court in the Contributor v. City of Brentwood case in which that involved a homeless newspaper and they wanted to sell it by walking up to cars at stoplights. And this court said, well, that is an effective way for you and we realize why you want to do it, but the fact that it works for you doesn't mean that we have to let you do it or that the First Amendment has to let you do it. And in that case, the court found that there were other means available to distribute the newspaper. So there is no argument here from our point of view that the government or I'm sorry, the newspaper gets to deliver things however it wants. Mr. Friday testified at the hearing that while he didn't think it would do it, if he wanted to, the Herald-Leader could drop its mailer from a low-flying plane. But the Supreme Court says, no, of course you can't do that. So there are limits on even how you deliver a traditional newspaper. The Herald-Leader frequently talks about the time-honored tradition of driveway delivery. There is no evidence in the record that there's a time-honored tradition of driveway delivery. I think today they even said going back 150 years. I don't think there were even driveways 150 years ago. So I don't think that you should recognize a driveway as being the same type of public forum as a street or a park, which is really what they're asking you to do. And this Court found in Job that a lawn does not invite communication and that a lawn is like a car. And I would submit that a driveway is like a lawn. In any event, you would concede that there are millions and millions of Americans who get newspapers in driveways today. And there are some Americans, a substantially fewer number, who have a tube for the paper at the street if they have a mailbox at the street. That is true. And I would believe also, Your Honor, that millions of Americans get their newspaper on a porch rather than the driveway. Probably depends on the character of the neighborhood. It probably does, Your Honor. I'd like to briefly address the McCullen case. That's really the only case they rely on for this idea that you should look at the lesser intrusive. The McCullen case is really unusual. It's a 35-foot boundary around abortion clinics. The interesting thing there is that boundary included sidewalks and streets. So it was precluding people from being in traditional public forums in order to deliver a message. Even the Court called the restriction truly exceptional. Truly exceptional. Here, ironically, the ordinance requires and promotes having these things delivered to a traditional forum, a door or a porch, and not left in the yard. And I see I'm out of time. Unless there are any questions, I thank the Court for your attention. All right. Thank you very much. And the case is submitted.